## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO: 21-10292 |
| | § | |
| WHO DAT ?, INC., | § | CHAPTER 11 SUB V |
| | § | |
| DEBTOR. | § | SECTION A |
| | § | |

### MEMORANDUM OPINION AND ORDER

*Who dat?  Who dat?  Who dat say dey gonna beat dem Saints?*

Today in New Orleans, the "Who dat?" phrase isn't just a cheer.  "It's a greeting.  It's an exclamation of joyous approval.  It's an expression of black-and-gold loyalty and civic pride, all wrapped up in one.  It's also become a part of the New Orleans identity."[1]  But where did it come from?  The origins of "Who dat?" as a cheer at local sporting events originated in the 1970s in majority-black high schools in Louisiana.  And then it was co-opted, trademarked, and marketed by one enterprising individual.

### FINDINGS OF FACT[2]

In October 1983, local amateur musician and promoter Steve Monistere and his brother, Sal, co-wrote and produced a song called *Who Dat!*[3]  "The Singing Saints" featured Aaron Neville

---

[1]     Mike Scott, *A 'Who Dat' History: The Story Behind the New Orleans Saints Rallying Cry*, The Times-Picayune, (May 24, 2017), https://www.nola.com/entertainment_life/vintage/a-who-dat-history-the-story-behind-the-new-orleans-saints-rallying-cry/article_cfb895a0-0830-54ba-a14e-4d2d25adb389.html. (last visited Mar. 27, 2024).

[2]     The findings of fact and conclusions of law contained herein are made pursuant to Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure.  To the extent that any of the findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

[3]     See this Court's opinion dated March 4, 2022, for background record citations.  [ECF Doc. 169].

singing lead on the track, backed by five New Orleans Saints football players performing the "Who Dat" chant.  The song became an overnight sensation, premiering on numerous local television and radio stations.  The instant success led Monistere to incorporate Who Dat?, Inc. ("WDI"), copyright the song, copyright a "Who Dat?" logo, and trademark the "Who Dat?" phrase in several categories (collectively, the "WDI Marks").  Leveraging the success of the song, WDI began selling goods printed with WDI Marks or licensing the WDI Marks to other companies to make and sell goods including jewelry, clothing, and consumables.

The success of WDI's song immediately drew the attention of the National Football League ("NFL") and its licensing arm.  In late 1983, the NFL and WDI quickly worked out a co-branding deal at the end of the Saints' football season.  The first product featuring both the WDI Marks and the NFL's trademarks was a t-shirt produced by Trench Manufacturing, the NFL's licensed t-shirt distributor at the time.  After that initial success, WDI continued to enter into licensing agreements with other NFL-approved licensees to produce and sell various products, including trinkets, earrings, and bumper stickers.  To build the brand, WDI hosted weekly, televised parties on Monday nights and other events in cooperation with the Saints; Saints players attended to help foster the relationship between "Who Dat?" and the Saints.  During the late 1980s, the relationship reached its peak, culminating in a well-established relationship between WDI, the NFL, and the Saints, and leading to the creation of a Who Dat Fan Club and a license agreement that allowed WDI to produce its own Saints-branded merchandise.

The Saints' success on the football field took a downward turn in the mid-1990s, and showcases such as the Who Dat Fan Club disappeared. The Saints' involvement with WDI remained stagnant throughout the 1990s and was essentially non-existent in the 2000s.[4]

---

[4]     *See* Greg Bishop, *Beneath Brown Bags, Saints Had Loyal Fans*, N.Y. Times (Feb. 4, 2010), https://www.nytimes.com/2010/02/05/sports/football/05bag.html (last visited Mar. 27, 2024).



But the Saints' 2009–2010 season changed everything.

Winning thirteen games in a row and the Super Bowl caused the "Who Dat" chant's popularity to explode, and illegal merchandise sporting the WDI Marks without proper licensing sprang up everywhere. That widespread violation of WDI's copyrights and trademarks led Monistere to reach out to NFL Properties with an agreement to confirm that WDI owned the WDI Marks. Although Monistere asserted to this Court that NFL Properties had agreed that WDI owned the WDI Marks, he stated that NFL Properties nevertheless sent cease-and-desist letters to local vendors instructing them to refrain from using the "Who Dat?" trademark and claimed ownership of the mark. Ultimately, the dispute over ownership and rights to the WDI Marks led WDI to file a lawsuit against the Saints in the United States District Court for the Middle District of Louisiana in March 2010.

In January 2012, after exchanging discovery in that case, the parties entered into a confidential settlement agreement which resolved the litigation (the "<u>Settlement Agreement</u>").

The Settlement Agreement required the Saints to pay WDI damages for infringement of the WDI Marks in past years and prohibited WDI going forward from unilaterally using the phrase "Who Dat" in combination with, among other things, (i) any words or symbols related to the Saints, such as the use of their black-and-gold color scheme and Fleur-de-Lis symbol; (ii) any current, future, or former Saints players or staff; (iii) the Superdome; or (iv) the NFL, its teams, or the sport of American football. The Settlement Agreement also contained a co-branding provision under which the Saints and WDI would cooperate to offer jointly licensed products. The Settlement Agreement further contained an arbitration clause.

Seven years later, in July 2019, the Saints accused WDI of violating the terms of the Settlement Agreement, filed a complaint in New York state court, and invoked the arbitration clause of the Agreement. The parties entered into an arbitration proceeding to resolve the disputes between them (the "Arbitration"). After a seven-day trial starting in late July 2020, the arbitrator issued an interim award in favor of the Saints on January 8, 2021, which, after receiving responses from the parties, she modified and issued to the parties and the American Arbitration Association on February 11, 2021 (the "Interim Award"). The arbitrator's Interim Award included findings that the Saints were entitled to a permanent injunction and damages for WDI's intentional, willful, and bad-faith trademark infringement and violation of the Settlement Agreement. *See* Saints Ex. II. The Interim Award also provided the arbitrator's calculation of damages.

On February 2, 2021, the arbitrator issued Scheduling Order No. 15 which provided, among other things, deadlines for WDI to submit certain financial information and for the Saints to propose language for the permanent injunction. Scheduling Order No. 15 also set a status hearing on March 16, 2022, and a final evidentiary hearing on April 22, 2021. On March 5, 2021, days before WDI was scheduled to submit comments to the Saints' draft injunction language, WDI filed

a petition in the United States District Court for the Eastern District of Louisiana seeking to vacate the Interim Award entirely.  *See Who Dat?, Inc. v. New Orleans, La. Saints, L.L.C.*, No. 21-474 (E.D. La. filed Mar. 5, 2021).  And on March 8, 2021, three days after filing that suit to vacate the Interim Award, WDI filed a petition for bankruptcy relief under subchapter V of chapter 11 of the Bankruptcy Code.  [ECF Doc. 1].[5]  That filing stayed the Arbitration, particularly the issuance of the arbitrator's final award.  Shortly after the bankruptcy filing, on April 26, 2021, the Saints filed a motion asking the Court to lift the automatic stay imposed by 11 U.S.C. § 362(a) to allow the Arbitration between the New Orleans Saints and WDI to conclude.  [ECF Doc. 55].  For the reasons stated in the Court's *Memorandum Opinion and Order*, [ECF Doc. 169], the Court lifted the automatic stay to allow the Arbitration to conclude.

Approximately eight months after the Court lifted the automatic stay, WDI filed a notice that the Arbitration had concluded.  [ECF Doc. 203].  The arbitrator awarded the Saints a total of $1,615,831.95 for damages, interest, attorneys' fees, and administrative costs (the "Final Arbitration Award").  *See* Saints Ex. FF; Proof of Claim No. 2-2.  In the Final Arbitration Award, the arbitrator also issued a permanent injunction detailing prohibited uses of the WDI Marks to avoid infringing upon the Saint's intellectual property (the "Permanent Injunction").[6]

---

[5]     On March 12, 2021, the Debtor filed a *Suggestion of Bankruptcy* in the District Court.  [EDLA No. 21-474, ECF Doc. 6].  On June 4, 2021, the District Court issued an Order staying the action to vacate the Interim Award.  [EDLA No. 21-474, ECF Doc. 7].

[6]     The Permanent Injunction in part mandates:

> WDI, its licensees, and any other persons or entities in active concert or participation with any of them, whether acting directly or indirectly, are permanently prohibited from producing, licensing, selling, distributing, marketing, advertising, merchandising, promoting, or displaying, in any medium whether known or hereafter devised (including, but not limited to, the internet, social media, the metaverse, and any gaming or virtual reality platforms), any goods, products, services, promotions, or advertisements that use or reference the following:

a. (i) The Saints' Marks or (ii) any Identifying Indicia that are either confusingly similar to the Saints' Marks or that otherwise expressly or impliedly suggest any affiliation or association with or to the Saints;

b. (i) The NFL Marks or (ii) any Identifying Indicia that are either confusingly similar to the NFL Marks or that otherwise expressly or impliedly suggest any affiliation or association with or to the NFL or any NFL Member Club;

c. The WDI Assets with a fleur de lis and a black-and-gold color scheme (regardless of the hue, color, or Pantone of the black or gold color(s));

d. The Who Dat Chant, except WDI may (i) use the Who Dat Chant in lyrics in WDI's musical works and (ii) allow other artists to make non-trademark use of the Who Dat Chant in lyrics in musical works;

e. The WDI Assets in combination with the following words, terms, phrases, symbols, marks, personas, or indicia (collectively as described in this subsection referred to as "Words and Symbols"):

    i. Saints;

    ii. New Orleans Saints;

    iii. former, current, or future Saints players or staff or their Likenesses.

    iv. Superdome,

    v. Saints Superfans (either one or multiple), meaning those individuals that create a persona intended to associate with the Saints, including, but not limited to, those identified in Exhibit 1, or Saints Superfans' Likenesses;

    vi. NFL;

    vii. Former, current, or future NFL Member Clubs;

    viii. "Super Bowl" or "World Champion(s)", whether used as one word or separate words;

    ix. "pregame," "postgame," "gameday" "tailgate," "season ticket(s)," "ticket holder(s)," "sports," "for the fan(s)," "game," or "team", whether used as one word or separate words, or any variations of the foregoing, if used in any manner that relates to or explicitly or impliedly refers in any manner to the Saints, the NFL, other NFL Member Clubs, or the sport of American football. Notwithstanding the foregoing, WDI shall not be prohibited from using such words, terms, or phrases if used in a manner or context that does not relate to or explicitly or impliedly refer to or create an association with the Saints, the NFL, other NFL Member Clubs, or the sport of American football;

    x. any other words, terms, phrases, symbols, marks, personas, Likenesses, or Identifying Indicia, or other indicia, if used in a manner or context that relates to or explicitly or impliedly refers to or creates an association with the Saints, the NFL, NFL Member Clubs, or the sport of American football.

f. The WDI Assets combined with a black-and-gold color scheme (regardless of the hue, color, or Pantone of the black or gold color(s)) and any of the "Words and Symbols";

g. The WDI Assets combined with a fleur de lis and any Words and Symbols;

Now before the Court are two contested matters:

- WDI's *Plan of Reorganization*, as amended (the "Plan"), [ECF Docs. 71, 225, 267 & 289]; the Saints' objection, as amended, [ECF Docs. 226 & 286]; and WDI's reply brief, [ECF Doc. 294]; and

- The Saints' *Motion To Dismiss or, Alternatively, To Convert*, [ECF Doc. 218]; WDI's opposition, [ECF Doc. 226]; and the Saints' reply brief, [ECF Doc. 232].

This Court has jurisdiction over both contested matters pursuant to 28 U.S.C. § 1334(b).  Both contested matters are "core" proceedings under 28 U.S.C. § 157(b)(2)(A), (L), and (O).  The Court has constitutional authority to enter final orders resolving both contested matters.  *See Stern v. Marshall*, 564 U.S. 462, 486–87 (2011).  To the extent necessary, the parties have impliedly consented to the entry of final orders here by this Court.  *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–85 (2015) (holding that a party impliedly consents to adjudication when the

---

h.      WDI or its licensees as the "Official _____ of the Who Dat Nation" where such designation either (i) violates any of the prohibitions of this injunction or (ii) is used during any television, radio, cable, online, or other broadcast or programming of football games, football pre-game shows, and football post-game shows, or other programming customarily or primarily related to or concerning the Saints, the NFL, the NFL Member Clubs, or the sport of American football;

i.      In or in connection with metadata, meta-tags, online search tools, or online search categories, the WDI Assets combined with any Words and Symbols and additionally either a black-and-gold color scheme (regardless of the hue, color, or Pantone of the black or gold color(s)) or a fleur de lis;

j.      Any variation of the Who Dat Chant combined with either (i) any Words and Symbols or (ii) other prohibited activity of this Injunction; and additionally, either (i) a black-and-gold color scheme (regardless of the hue, color, or Pantone of the black or gold color(s)) or (ii) a fleur de lis;

k.      Illustrative examples of prohibited and permitted conduct under ¶ 3 are set forth in Exhibit 3 to this Permanent Injunction. These examples are not intended to be exclusive but, instead, to provide guidance on the intended application and scope of the injunctive relief provided by this Permanent Injunction.

Saints Ex. GG, § 3.

party "voluntarily appear[s] to try the case" with knowledge of the need for consent and without affirmatively refusing to provide it).

The Court held a three-day evidentiary hearing from June 20–22, 2023, to resolve the contested matters. A listing of appearances, testifying witnesses, and exhibits admitted into evidence are in the record. [ECF Doc. 301]. The evidence revealed the following:

- The Debtor has no employees and is owned and operated by Monistere and Greg Latham, an intellectual property attorney and member of Intellectual Property Consulting, LLC ("IPC"), which represented WDI in the Arbitration. *See* Hr'g Tr. 34:2–36 (June 20, 2023) [ECF Doc. 303]. Monistere's wife, Kim, serves as bookkeeper.

- The WDI Marks represent WDI's only asset and the licensing of the WDI Marks is WDI's only source of revenue; WDI does not market the WDI Marks, however, and has no marketing budget. *See* Hr'g Tr. 31:2–21 (June 21, 2023), [ECF Doc. 304]. But the value of the WDI Marks is uncertain to a licensee if the licensee is unable to pair the WDI Marks with intellectual property belonging to the Saints, such as the use of the black-and-gold color scheme and Fleur de Lis symbol; hence, licensees are hesitant at this time to execute license agreements with WDI. *See* Hr'g Tr. 101:13–102:1; 151:9–22 (June 21, 2023).

- For purposes of the hearing to consider confirmation of WDI's Plan and "solely for the limited purpose of the Debtor establishing hypothetical liquidation value at the Hearing, that the value of the Debtor in a hypothetical liquidation conducted under chapter 7 of title 11 of the United State Code," the Saints and WDI stipulated that the WDI Marks are valued at $245,000. *See* Debtor Ex. 5; Saints Ex. KK.

- At the time of the confirmation hearing, WDI had only two licensees. *See* Hr'g Tr. 34:1–38:20 (June 20, 2023). As of the confirmation hearing, WDI had not entered into any new license agreements since October 2022. *See* Hr'g Tr. 81:8–25 (June 20, 2023).

- WDI's Monthly Operating Reports ("MOR") indicate that it entered bankruptcy in March 2021 with $3,501.20 cash on hand at the end of the month. *See* Debtor Ex. 20. WDI's monthly cash receipts has never exceeded $16,000; more often than not, WDI's cash receipts hover around $2,500, as many sources of income were one-time occurrences. *See* Debtor Exs. 20–45; Hr'g Tr. 75:22–77:25 (June 21, 2023). Importantly, WDI did not pay insiders' management or website fees during the course of WDI's bankruptcy case; at the time of confirmation, the MORs documented WDI owing over $300,000 in such fees. *See* Debtor Exs. 20–45.

- On April 22, 2021, the Court issued an Order setting June 11, 2021, as the bar date for filing non-governmental proofs of claim in the Debtor's bankruptcy case. [ECF Doc. 51]. To date, only two proofs of claim have been filed: (i) the IRS filed Proof of Claim

No. 1 for $952.00, but it later amended its proof of claim to zero; and (ii) the Saints filed Proof of Claim No. 2, asserting a general unsecured claim of $1,615,831.95 stemming from the Final Arbitration Award.  Thus, the Saints are the only prepetition creditor of the estate.

- In addition to the proofs of claim filed, WDI anticipates owing administrative expenses to (i) Lugenbuhl, Wheaton, Peck, Rankin & Hubbard ("Lugenbuhl") in excess of $175,000 for its work representing WDI; (ii) Dwayne Murray, the Subchapter V trustee (the "Trustee") in the amount of $6,500 for his services; (iii) Chaffe & Associates in the amount between $6000 and $15,500 for its valuation services; and (iv) IPC, an insider, in the amount of $36,056.84 for its legal services representing WDI in the Arbitration.

- The Plan proposes that WDI will pay the Trustee and Chaffe & Associates their allowed administrative expense claims from cash on hand on the effective date. WDI's Plan estimates those allowed administrative expenses to be $22,000.

- WDI has no secured creditors.  After payment of administrative expense claims other than legal fees owed to Lugenbuhl, WDI's Plan proposes treatment of Lugenbuhl's administrative expense claim, the Saints' general unsecured claim (Class 3), and equity interests (Class 4).

- During the first two quarters of the plan, the Trustee, on behalf of WDI, will make a minimum distribution of $10,000. Following the first two quarters, WDI must have available cash flow of approximately $8,000 monthly to pay proposed disposable income.

- To fund the plan distributions, WDI proposes to contribute revenue generated from its ongoing operations.  If in quarters 3–12, WDI generates more than $23,800, the Trustee will distribute 20% of that excess.  If WDI does not generate enough revenue to make its minimum distribution in a quarter, then the Trustee will draw on two letters of credit to make the minimum payment.  Those letters of credit were obtained by WDI's principals for the benefit of WDI.  Together, the two letters provide $250,000 for distribution.[7]

- Debtor's counsel, Lugenbuhl, will receive no more than 80% of any distribution made under the Plan; so if the Plan proposes to pay approximately $250,000, Lugenbuhl would receive $200,000 of that amount.  *See* Hr'g Tr. 111:25–118:3 (June 22, 2023),

---

[7]    Initially, the Plan proposed that WDI's principals would make disbursements in contravention of 11 U.S.C. § 1194(b) and contemplated that they would not draw on the letters of credit to make disbursements until the end of the three-year Plan term, even if WDI earned no disposable income and, therefore, made no quarterly disbursements for the entire Plan term.  Based upon cross-examination of Monistere and questions posed by the Court during the first two days of trial, WDI modified its Plan on the third day of trial to change Plan provisions related to those issues.  *See* Hr'g Tr. 6:5–15:8 (June 22, 2023), [ECF Doc. 305]; *see also* [ECF Doc. 295].  That modification also capped Lugenbuhl's distribution and limited disbursements for the first two quarters post-effective date.  *See* Hr'g Tr. 6:5–15:8 (June 22, 2023); *see also* [ECF Doc. 295].

[ECF Doc. 305]; Debtor Ex. 2.  The Trustee will receive an additional $8,000 over the 12 quarters for his work as the distribution agent.  IPC has agreed to waive its claim if the Plan is confirmed.  *See* Hr'g Tr. 10:7–10; 112:10–21; 125:17–126:16 (June 20, 2023); Debtor Ex. 2.  The Saints, the only general unsecured creditor with an allowed claim of $1,615,831.95, will receive the residual distributions made under the Plan, which is estimated to be less than 3% distribution to general unsecured creditors.  *See* Hr'g Tr. 124:12 – 125:15 (June 20, 2023); Hr'g Tr. 122:12–123:10 (June 21, 2023); Debtor Ex. 1.

- The Plan will pay out at least $258,000 over twelve quarters according to priority:  (i) $200,000 to Lugenbuhl per its agreement to receive less than it is owed; (ii) $50,000 to the Saints; and (iii) $8,000 to the Trustee as post-petition distribution agent.

- Under the proposed Plan, Monistere and Latham, will retain their equity interests in the reorganized WDI and will, therefore, retain control over the WDI Marks.  *See* Hr'g Tr. 117:20–119:18 (June 21, 2023).

- The Plan estimates that creditors would receive $245,000 in a liquidation. *See* Hr'g Tr. 120:2–4; Debtor Ex. 1.

- Class 3, comprised of the Saints' general unsecured claim, is impaired.  Class 3 voted to reject the Plan.  *See* Debtor Ex. 3.  Class 4, comprised of insider claims and equity interests, is impaired.  Class 4 voted to accept the Plan.  *See id.*

- Steve Monistere, President of WDI, testified on behalf of WDI.  His testimony conveyed a complete disconnect between WDI's financial projections proposed in support of the Plan and the reality that (i) WDI currently holds only two licensee agreements and has no plan or strategy for marketing the WDI Marks to new licensees, (ii) the value of the WDI Marks to a potential licensee is directly tied to the ability to pair or co-brand the WDI Marks with intellectual property held by the Saints, and (iii) approximately 70% of WDI's prepetition income derived from IP-infringing products under the Settlement Agreement.  *See* Saints Ex. II; Hr'g Tr. 57:13–66:3 (June 21, 2023).  Indeed, Monistere indicated that licensees were hesitant to execute license agreements with WDI in light of the Permanent Injunction.  *See* Hr'g Tr. 148:13–152:11 (June 21, 2023).  Monistere testified that he had not shared written copies of the Permanent Injunction with current or potential licensees, which, is itself a violation of the Permanent Injunction.  *Id.*  Importantly, Monistere's testimony revealed that WDI has not made significant changes to its operations to be able to comply with the Permanent Injunction going forward, in spite of the fact that Monistere's business partner is an attorney specializing in intellectual property law who represented WDI in the Arbitration.  *See* Hr'g Tr. 29:15–32:10 (June 21, 2023).  Monistere's testimony also revealed hostility and recalcitrance to complying with the Permanent Injunction going forward; Monistere's testimony suggested that WDI would continue to challenge the issuance of the Permanent Injunction.  *See* Hr'g Tr. 87:6–104:8 (June 21, 2023).  Indeed, although WDI's bankruptcy counsel conceded that the Permanent Injunction was effective when issued by the arbitrator, *see* Hr'g Tr. 11:23–15:2 (June 22, 2023),

[ECF Doc. 305], the Plan suggests that the effectiveness of the Permanent Injunction is an issue for debate:

> For the avoidance of doubt, to the extent that the Permanent Injunction issued by the arbitrator in favor of the New Orleans Louisiana Saints, LLC is confirmed by a court of appropriate authority and becomes effective, the Permanent Injunction is not subject to discharge under this provision.

Plan, art. IX, [ECF Doc. 295]; *see also* Hr'g Tr. 11:23–15:9 (June 22, 2023), [ECF Doc. 305].

- Patrick Gros, Certified Public Accountant, provided expert testimony on behalf of the Saints and specifically addressed the feasibility of WDI's projections. *See* Hr'g Tr. 166:19–202:9 (June 21, 2023). Gros has been qualified as an expert in accounting, bankruptcy, and valuation over sixty times. *See* Hr'g Tr. 166:24–167:24. The Court found Gros to be an earnest, competent, reliable witness and gives much weight to his testimony. Gros testified that income projections for debtors emerging from bankruptcy proceedings are most reliable when they are based upon post-petition data. *See* Hr'g Tr. 174:1–10; 177:7–15. WDI's projections, however, relied on financials from 2018 and 2019, several years prior to the petition date and plan confirmation. *See* Hr'g Tr. 175:20–22. That data is several years old, cherry-picks performance from WDI's best two years of operations, and does not account for the effects of either COVID or Hurricane Ida. *See* Hr'g Tr. 175:24–177:1. Additionally, WDI's Plan fails to consider the effect that the Arbitration Final Award and Permanent Injunction have on WDI's ongoing operations. *See* Hr'g Tr. 185:16–25; 188:19–25. As a result, Gros testified, WDI's financial projections are severely inflated. WDI's projected monthly gross income and net cash flow over the next three years are increased by approximately 79% and 158%, respectively, compared to actual averages taken from WDI's 26 MORs. *See* Hr'g Tr. 180–182. Those MORs also indicate that WDI has experienced negative monthly net cash flow 31% of the time since filing for bankruptcy. *See* Hr'g Tr. 191–192. At the same time, Gros testified, WDI's projected monthly expenses decrease by approximately $100 compared to the Debtor's actual expenses. *See* Hr'g Tr. 182:13–25. Gros testified that he has never observed a company increase gross income and net cash flow as significantly as WDI projects to do in only three years without also increasing costs. *See* Hr'g Tr. 183:4–10. Gros observed that WDI did not provide any data or documentation in its Plan to support those inflated projections. *See* Hr'g Tr. 184–185. Ultimately, Gros testified that, based on the financials that he reviewed for WDI, creditors and the Court should expect WDI to default or be forced to draw on their letters of credit as early as the second quarter post-effective date. *See* Hr'g Tr. 186–190.

- Jeffrey Myers, forensic accountant, also provided expert testimony on behalf of the Saints in the areas of financial forensics, statistics, and business valuation. *See* Hr'g Tr. 16:11–52:14 (June 22, 2023). Myers testified as the Saints' expert witness in the Arbitration and has reviewed WDI's financial statements since 2012, as well as profit-and-loss statements, bank statements, tax returns, license and royalty reports, and royalty contracts for certain periods of time produced by WDI in that litigation and the

bankruptcy case.  *See* Hr'g Tr. 22:4–23:22.  The Court found Myers to be a competent, thorough, and honest witness and gives maximum weight to his testimony.  Myers revealed that, based on the findings of the arbitrator as applied to the source of WDI's total revenue for years 2012 through 2020 ($395,023), approximately 96% of those revenues derived from products that infringed upon the Saints' intellectual property.  *See* Hr'g Tr. 25:18–36:12.  Myers' testimony also revealed that the number of WDI's licensees has declined since 2019.  *See* Hr'g Tr. 36:13–40:3.  In 2019, WDI licensed the WDI Marks to 25 licensees; of those, the arbitrator found that 21 of the 25 licensees sold infringing products.  *See id.*  In 2021, WDI had 13 licensees; in 2022, WDI had 8 licensees.  *See id.*  In 2023, WDI was down to 2 licensees.  *See id.*  To sum up Myers' testimony:  WDI is "trending down" as a company as it seeks to exit bankruptcy in every business aspect.  *See* Hr'g Tr. 40:4–46:9.  As to WDI's financial projections offered in support of its Plan, Myers testified that "their projections are not founded n any actual financial performance that WDI has ever realized."  Hr'g Tr. 45:11–12.

- Steven Benjamin "Ben" Hales, Senior Vice President and Chief Operating Officer for the Saints, provided testimony on behalf of the Saints.  *See* Hr'g Tr. 53:1–89:15 (June 22, 2023).  Hales has worked his way up through the Saints organization for twenty years.  *See* Hr'g Tr. 53:24–54:17.  In his current position, Hales oversees marketing, business operations, consumer insights and analytics, game experience, and brand management.  *See* Hr'g Tr. 54:18–58:12.  Hales testified as to the detrimental financial effect that intellectual property infringement has on the areas of the Saints organization that he manages, particularly brand management and customer game experience.  *See* Hr'g Tr. 58:13–60:7.  The Court found Hales to be a straightforward, practical, and honest witness and give much weight to his testimony.  Hales charted the strained relationship between the Saints and WDI through litigation and the Arbitration and, based on that experience, expressed his disbelief that WDI was willing or able to comply with the Permanent Injunction going forward:

  > Q:     So we've seen the settlement agreement, and you've told us about the issue following that in terms of compliance with the settlement agreement.  And we've seen the permanent injunction, we've talked about compliance with that.  What is the pattern of conduct that you see from WDI?

  > A:     I think the pattern we've seen is regardless of what the agreement is . . . regardless of whether we have an interim award, a final award, a permanent injunction, it gets reinterpreted and it doesn't get enforced.  There's always a reinterpretation after the fact that leads to either them not adhering to it, or us having to go to Court and spend more money in order to get them to live up to those terms.

  > Q:     And based on your experiences with WDI over the years and your perceptions based on those experiences, do you think that WDI's pattern of conduct is an accident?

A:     I don't see how it could be.

Q:     And why do you say that?

A:     I think one of the fundamental things, and I've gone through the history of we had this agreement and it doesn't work.  We have to go now, get this thing, that doesn't work.  We're at this point, even with the permanent injunction, we can't get that issued.  And when you look at it, how—I mean, at a certain point, past performance is indicative of future results.

We go through this process, and in a lot of times, the claim is that, look, we're a small mom and pop company.  We're not a big company like you [Saints].  But the reality is [that] [WDI is] an intellectual property company.  They are co-owned by the principal of an intellectual property law firm.  Nobody should know better than they do, but instead, we're the ones who get dragged through these highly expensive proceedings, while they really aren't ever held accountable for what they do.

Hr'g Tr. 80:20–82:6.

## CONCLUSIONS OF LAW

Effective February 19, 2020, the Small Business Reorganization Act added new Subchapter V provisions codified at 11 U.S.C. §§ 1181–1195, designed to streamline the reorganization process for small business debtors.  Section 1191 of the Bankruptcy Code provides the rules for confirmation of a plan filed in a Subchapter V case.  Section 1191(a) requires that all of the requirements of § 1129(a) (other than paragraph (15)) be met.

WDI, as the Plan proponent, bears the burden of establishing that each requirement for confirmation has been met by a preponderance of the evidence.  *See In re Pearl Res. LLC*, 622 B.R. 236, 260 (Bankr. S.D. Tex. 2020); *In re Sea Trail Corp.*, No. 11-07370, 2012 WL 5247175, at *4 (Bankr. E.D.N.C. Oct. 23, 2012) (citation omitted); *In re Multiut Corp.*, 449 B.R. 323, 332–33 (Bankr. N.D. Ill. 2011).  "The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, regardless of the absence of valid objections to

confirmation." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001) (citations omitted).

Here, assuming that all other provisions of § 1129(a) are either met or are inapplicable to Subchapter V cases, this Court declines to confirm WDI's Plan, finding that the Plan was not filed in good faith as required by § 1129(a)(3) and that any confirmation of the Plan is likely to be followed by the liquidation or the need for further financial reorganization of WDI in contravention of the requirements of § 1129(a)(11).

## A. WDI Did Not Propose the Plan in Good Faith.

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." The Bankruptcy Code does not define "good faith" for purposes of plan confirmation, but the Fifth Circuit has interpreted "good faith" as requiring a reasonable likelihood that the proposed plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *See Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.–Irving)*, 939 F.2d 289, 292 (5th Cir. 1991). In a corporate reorganization, a plan proposed in good faith must bear some relation to the Bankruptcy Code's objective of resuscitating a financially troubled company. *See In re Coastal Cable T.V., Inc.*, 709 F.2d 762, 764–65 (1st Cir. 1983). The requirement of good faith "is viewed in the context of the circumstances surrounding the plan." *In re Block Shim Dev. Co.–Irving*, 939 F.2d at 292 (citing *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)).

The evidence before the Court revealed that WDI is highly unlikely to ever generate revenues sufficient to make the minimum distributions promised under the Plan. The Court agrees with the credible testimony offered by Gros and Myers and finds that WDI's disposable income projections are entirely unsupported, overstated, and unrealistic. WDI will, in all probability,

default in the first quarter of Plan payments, thus triggering the Trustee to draw down immediately

on the letters of credit obtained by WDI's principals as a backstop for creditors. Although the

existence of funding through those letters of credit—if certain and available—may mean that

technically WDI satisfies § 1129(a)(7) and is able to distribute to each holder of a claim an amount

not less than it would receive in a liquidation under chapter 7, the reality is that there is but one

non-insider prepetition creditor in this case. The Saints hold a $1.6 million general unsecured

claim. But the Saints stand in line behind the administrative expense claim held WDI's bankruptcy

counsel. So, of the $250,000 available through the letters of credit that is promised to creditors

under the Plan, Lugenbuhl will take $200,000 (less than it is owed per the agreement with WDI)

and the Saints are left with $50,000, or less than a 3% distribution on their general unsecured claim.

To be clear, it is not unusual for a confirmed plan in chapter 11 or chapter 13 to distribute such a

low percentage to general unsecured creditors given the Bankruptcy Code's priority scheme. What

is suspect is a plan that is, in essence, only a payment plan for a debtor's bankruptcy attorney's

fees. *Cf. In re Dicey*, 312 B.R. 456, 459–60 (Bankr. D.N.H. 2004) ("Congress did not create

Chapter 13 as a vehicle solely for the payment of attorney's fees.").

The evidence demonstrates that WDI is a financially troubled company, but not one that

can be resuscitated. With any revenue syphoned off by management for fees for years prepetition,

WDI never cash-flowed. As it turns out, according to the arbitrator, the revenue that WDI did

generate derived in large part from products infringing upon the Saints' intellectual property. And

while, at one point, WDI's principals and the Saints shared a positive co-branding agreement, that

relationship soured after years of trademark litigation and an Arbitration resulting in a crippling

Final Award and Permanent Injunction against WDI. WDI has seen its licensees fall away and

with them, its revenues. The evidence demonstrated to this Court that WDI's management has

neither the will nor the skill to comply with the Permanent Injunction and market the WDI Marks to new licensees at the same time.   So if chapter 11 cannot reanimate this zombie company, who benefits from this process?

The answer to that question is WDI's principals.  Under the proposed Plan, Monistere and Latham will retain their equity interests in WDI—and thus continue to use and control the WDI Marks—without having to pay in full more senior impaired and unaccepting Class 4 general unsecured claim, that is, the Saints' claim.  If WDI had filed its case in chapter 11 and its prepetition equity interest holders desired to hold on to those interests, WDI's plan would either have to adhere to the absolute priority rule vis-à-vis the Saints or, alternatively, its prepetition equity interest holders could explore the court-developed "new value" exception to the absolute priority rule, which allows prepetition equity interest holders to purchase and thus retain their interests if certain conditions are met.[8]

But WDI proceeded under Subchapter V.  Indeed, a hallmark of Subchapter V is that it allows business owners the opportunity to reorganize their businesses through a streamlined process without the full burden of the absolute priority rule.  Subchapter V has its own built-in protections for unsecured creditors, however.  "[S]ubchapter V allows a debtor's principal to use sweat equity, future income, and other kinds of consideration as a means to retain the principal's ownership interest with respect to unsecured creditors."  *In re Cleary Packaging, LLC*, No. 21-10765, 2023 WL 8703920, at *14 n.47 (Bankr. D. Md. Dec. 15, 2023).  "These concepts are

---

[8]   "For the new value exception to apply, there must be (1) a contribution that is new capital; (2) the contribution must be necessary for a successful reorganization; (3) the contribution must be in money or money's worth; and (4) the contribution must be reasonably equivalent to the value of the property acquired by the Purchaser."  *In re Cypress Land Partners, I*, 409 B.R. 396, 438 (Bankr. S.D. Tex. 2009) (citing *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 445 (1999)).

embedded in the 'projected disposable income' test of section 1191(b), (c), and (d) of subchapter V of chapter 11 of the Code." *Id*. In other words,

> the absolute priority rule under § 1129(b)(2)(B) is eliminated for cramdown, which **will allow existing owners to retain their full ownership without giving any new value, but only if the plan provides for the debtor to distribute all of its projected disposable income over at least three years** from the date the first payment is due under the plan (or property having a value of at least that amount). The absolute priority rule has been replaced with the "fair and equitable" requirement to protect dissenting unsecured classes similar to those requirements found in applicable Chapters 12 and 13 cases and individual Chapter 11 cases.

*In re EAS Graceland, LLC*, No. 20-24484, 2021 WL 10395821, at *9 n.7 (Bankr. W.D. Tenn. July 20, 2021) (citing 11 U.S.C. § 1181(a)) (emphasis added). Thus, in Subchapter V, only one path exists for equity interest holders to retain those interests over the objection of general unsecured creditors: contribution of projected disposable income. The "new-value" exception to the absolute priority rule has no role in Subchapter V where the absolute priority rule itself has been eliminated.

Here, the evidence before the Court highlights the reality that Monistere should know better than anyone else: WDI has no potential for generating disposable income. Therefore, Plan payments must be made via the letters of credit that Monistere has obtained. The Court views the $250,000 in letters of credit to be Monistere's and Latham's inappropriate attempt to utilize a "new value" exception in a Subchapter case. Why would Monistere and Latham make that attempt? To avoid WDI's liquidation and the subsequent loss of the WDI Marks.

This Plan does not represent a genuine, good-faith effort to reorganize WDI. Instead, the Court finds that this Plan served only as a vehicle for the personal interests of WDI's principals and an attempt by those principals to manipulate the bankruptcy process to the detriment of the estate's sole non-insider prepetition creditor. The record before the Court supports no finding of a reasonable likelihood that the proposed Plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code. Thus, the Court finds that WDI has failed to carry its burden

to show that the Plan was filed in good faith pursuant to § 1129(a)(3) and denies confirmation. *See Double H Transp. LLC v. Odell (In re Double H Transp. LLC)*, 603 F. Supp. 3d 468, 478 (W.D. Tex. 2022) (affirming a finding that plan with no "reasonable hope of success" was not filed in good faith "given the bankruptcy court's finding that Debtor's projections were 'incomprehensible, inconsistent,' and generally not proven by any 'credible . . . supporting evidence'"); *In re Rusty Jones, Inc*., 110 B.R. 362, 375 (Bankr. E.D. Ill. 1990) (finding a plan that served the personal profit interests of insiders and contrary to the interests of creditors was not filed in good faith).

### B.  WDI's Plan Is Not Feasible Per § 1129(a)(11).

The text of § 1129(a)(11), known as the "feasibility test," requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor[s] or any successor to the debtor[s] under the plan, unless such liquidation or reorganization is proposed in the plan."  The feasibility standard requires this Court to consider whether the Plan offers a reasonable probability of success.  "When assessing whether a plan of reorganization is feasible, bankruptcy courts consider factors such as the adequacy of the debtor's capital structure, the earning power of the business, economic conditions, the ability of management, the probability of the continuation of the same management, and any other related matter."  *In re Two Streets, Inc*., 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019) (citation omitted).

The evidence demonstrates Monistere's inability or unwillingness to modify WDI's ongoing operations in light of the Permanent Injunction.  WDI's principals appear to continue to see the bankruptcy process as an avenue to relitigate the results of the Arbitration, rather than rehabilitate WDI to function as a going concern.  *See* Hr'g Tr. 72:1–14 (June 20, 2023) (testimony of Monistere explaining that "we filed a lawsuit at District Court here in New Orleans to have [the

18

Interim Award] put aside, have it saved, and— and then we were looking at, okay, well, we're going to have to fight this moving forward. . . . And the only way to survive so that we can fight and make our case is to file bankruptcy, which, that decision was made").  More concerning is Monistere's implication that WDI has left the door open to continue to challenge or circumvent the Final Arbitration Award and Permanent Injunction post-confirmation.  *See* Hr'g Tr. 87:24– 89:17 (June 21, 2023).

Monistere's testimony revealed a resentment toward the findings contained in the Final Arbitration Award and resistance to complying with the Permanent Injunction going forward.  *See* Hr'g Tr. 87:6–104:8 (June 21, 2023).  Monistere has not provided written copies of the Permanent Injunction to all of its current or prospective licensees as required by the terms  of the Permanent Injunction.  *See id.*  Some licensees, relying on Monistere's own interpretation of the Permanent Injunction, have continued to operate with WDI without written contracts.  *See id.*  Other licensees have either ceased operating with WDI entirely or paused operations until there is more certainty concerning WDI's future operations.  *See* Hr'g Tr. 75:14–76:9; 83:15–25 (June 21, 2023).  The evidence before the Court demonstrates that WDI has no strategy to modify its ongoing operations to be able to both comply with the terms of the Permanent Injunction **and** generate income from non-infringing licensing of the WDI Marks.  *See* Hr'g Tr. 29:15–32:10; 107:21–108:7 (June 21, 2023).  The most Monistere has done to comply with the Permanent Injunction and to monitor WDI's licensees' marketing of infringing products is to increase his own "sweeps" on the Internet to hunt for infringing behavior—but Monistere himself admits that he and Latham, his partner and intellectual property lawyer who represented WDI in the Arbitration, find the Permanent Injunction to be "confusing."  *See* Hr'g Tr. 87:6–104:8 (June 21, 2023).

This Court is entirely unconvinced that Monistere and Latham will be able to ensure that WDI will not continue to violate the Permanent Injunction and infringe upon the Saints' intellectual property going forward and thereby subject WDI to further monetary sanctions. For that reason, the Court cannot find that confirmation of this Plan is not likely to be followed by a liquidation of this debtor.[9]

### C. The Court Exercises Its Discretion To Convert WDI's Case to One Under Chapter 7.

       *1.  Standards of review in deciding motions filed pursuant to 11 U.S.C. § 1112(b)*

The Saints have moved under 11 U.S.C. § 1112(b)(1) for dismissal of WDI's bankruptcy case for cause. [ECF Doc. 218]. Section 1112 requires a bankruptcy court to convert a chapter 11 case to one under chapter 7 or dismiss it entirely, "whichever is in the best interests of creditors and the estate, **for cause** . . . ." 11 U.S.C. § 1112(b)(1) (emphasis added). "The purpose of § 1112(b)(1) is to preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *Loop Corp. v. U.S. Tr. (In re Loop Corp.)*, 379 F.3d 511, 516 (8th Cir. 2004). The Bankruptcy Code does not expressly define "cause" as it is used in § 1112(b)(1), but it does set forth a non-exhaustive list of examples of events that may constitute cause. Specifically, the Saints assert dismissal is warranted under one of those enumerated events, and allege cause for dismissal exists under § 1112(b)(4)(A) because there is both (1) a substantial or continuing loss to or diminution of the estate and (2) the absence of a reasonable likelihood of rehabilitation.

---

[9]      Arguably, the continued employment of Monistere as an officer of WDI is prohibited by § 1129(a)(5) due to his unwillingness to comply with the terms the Permanent Injunction and act in the best interests of WDI. *See In re SM 104 Ltd.*, 160 B.R. 202, 239–42 (Bankr. S.D. Fla. 1993) (finding that post-confirmation installment of officer of the debtor who "flaunted . . . state court orders as if they did not exist" and caused financial harm to the debtor was prohibited by § 1129(a)(5)).

"The party seeking dismissal or conversion bears the burden of proving cause by a preponderance of the evidence." *In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015) (citation omitted). "Thus, until the movant carries the burden, the statutory direction that the court 'shall convert the case to a case under chapter 7 or dismiss the case' is not operative." *In re Perez*, No. 12-03808, 2014 WL 3547056, at *4 (Bankr. D.P.R. July 17, 2014) (quoting 7 Collier on Bankruptcy ¶ 1112.04[4] (Alan N. Resnick & Henry J. Sommer, eds. 16th ed.)). "Once cause is found, the burden shifts to the opposing party to show why dismissal or conversion would not be in the best interests of the estate and the creditors." *In re Costa Bonita Beach Resort, Inc.*, 513 B.R. 184, 195 (Bankr. D.P.R. 2014) (citing *In re Dr. R. Samanta Roy Inst. of Sci. Tech.*, 465 F. App'x 93, 96–97 (3d Cir. 2011)). Upon a finding of cause, "the court has broad discretion to determine whether conversion or dismissal is in the best interest of creditors and the estate." *In re Perez*, 2014 WL 3547056, at *4 (citing *Gilroy v. Ameriquest Mortg. Co. (In re Gilroy)*, No. 07-054, 2008 WL 4531982, at *4 (B.A.P. 1st Cir. Aug. 4, 2008)); *see also In re Costa Bonita Beach Resort, Inc.*, 513 B.R. at 195.

> 2. *The Court finds that WDI has experienced substantial and/or continuing loss to or diminution of its estate.*

"In determining whether there is a continuing loss to or diminution of the estate, courts look beyond a debtor's financial statements and make a full evaluation of the present condition of the estate." *In re Briggs-Cockerham, L.L.C.*, No. 10-34222, 2020 WL 4866874, at *5 (Bankr. N.D. Tex. Nov. 23, 2010) (internal quotations and citation omitted). "If the loss is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors, the loss is substantial." *In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015) (citation omitted). "Cause can be shown by demonstrating that the debtor suffered or has continued to experience a negative cash flow or

21

declining asset values following the order for relief." *Id.* (citing *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014)). And "[n]egative cash flow alone can be sufficient cause to dismiss or convert under § 1112(b)." *Id.* (citing *In re Miell*, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009)).

WDI's MORs show it is generating minimal income. WDI has not generated sufficient income to pay its own management fees, which, according to the MORs, have continued to accrue each month during the bankruptcy case. *See* Debtor Exs. 20–45. WDI does not generate the volume of income required to pay its bankruptcy counsel's administrative expense claims that also continue to accrue or the Saints' prepetition general unsecured claim. *See* Debtor Exs. 20–45. The evidence before the Court also revealed that WDI currently holds less than a handful of licensee agreements and has no marketing budget to pursue new licensees. *See* Hr'g Tr. 29:15–32:10 (June 21, 2023). Most concerning to the Court is the fact that WDI's management—which includes an attorney specializing in intellectual property law—has not acknowledged the impact that the Permanent Injunction has had and will have on WDI's ability to move forward as a going concern and thus has implemented no changes or innovations in operations to be able to comply with the Permanent Injunction and generate new business for WDI. At this point, with confirmation denied, WDI is essentially not operating and the estate is administratively insolvent. For those reasons, the Court finds that WDI has suffered and will continue to suffer substantial and/or continuing loss to or diminution of its estate.

### 3. The Court finds that WDI has no reasonable likelihood of rehabilitation.

As used in § 1112(b)(4)(A), "rehabilitation does not necessarily denote reorganization, which could involve liquidation[;] [i]nstead, rehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis.'" *In re Westgate Props., Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010). For example, if "the debtor, or some

other party, will be able to stem the debtor's losses and place the debtor's enterprise back on a solid financial footing within a reasonable amount of time, then the debtor may have a reasonable likelihood of rehabilitation." *In re Costa Bonita Beach Resort, Inc*., 479 B.R. 14, 42 (Bankr. D.P.R. 2012) (internal quotations and citation omitted). "The issue of rehabilitation for purposes of Section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *In re TMT Procurement Corp*., 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015) (quoting *In re LG Motors, Inc*., 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009)).

For many of the same reasons discussed above, the Court finds that WDI has no reasonable likelihood of rehabilitation. WDI has one asset and one method of generating business: it licenses the WDI Marks. Given the effect that the Permanent Injunction has had on current and potential licensees' willingness to do business with WDI and the failure of management to adapt operations to account for the Permanent Injunction, put simply, WDI has no business prospects. Thus, the Court finds cause to convert or dismiss WDI's case under § 1112(b)(4)(A).

### 4. *Defenses to dismissal or conversion*

Once a finding of "cause" is made, the Bankruptcy Code requires the Court to convert or dismiss the case, unless one or more factors exist. First, § 1112 requires the Court to consider whether "the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." *Id*. § 1112(b)(1). The Court finds that it is not. This case is not complex; WDI has one asset and one non-insider prepetition creditor. The Court cannot fathom any benefit to the appointment of an examiner in this instance.

Second, § 1112(b)(2) prevents the dismissal or conversion to chapter 7 if "unusual circumstances" exist, but that exception requires the following findings:

(A)   there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B)   the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph 4(A) [substantial and continuing losses or the absence of a reasonable likelihood of reorganization]—

(i)   for which there exists a reasonable justification for the act or omission; and

(ii)   that will be cured within a reasonable time fixed by the court.

*Id.* § 1112(b)(2)(A)–(B). "Section 1112(b) does not define unusual circumstances, but the phrase contemplates conditions that are not common in chapter 11 cases." *In re New Towne Dev., LLC,* 404 B.R. 140, 147 (Bankr. M.D. La. 2009) (internal quotations and citation omitted). "Courts have much discretion in determining whether there are unusual circumstances that weigh against conversion or dismissal." *Id.* at 147 (citations omitted). But "[a] debtor's burden to demonstrate 'unusual circumstances' under § 1112(b)(2) to overcome conversion or dismissal is not applicable where a party-in-interest has established cause to convert or dismiss under § 1112(b)(4)." *In re Ford Steel, LLC,* 629 B.R. 871, 883 (Bankr. S.D. Tex. 2021); *see also* 11 U.S.C. § 1112(b)(2); *Andover Covered Bridge, LLC v. Harrington* (*In re Andover Covered Bridge, LLC*), 553 B.R. 162, 177 (1st Cir. B.A.P. 2016).

The Court finds no unusual circumstances in the record before it that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate.

### 5.   *The Court converts this case to one under chapter 7*

After hearing the evidence and arguments of counsel, the Court will exercise its broad discretion and convert the case to one under chapter 7 in the best interests of creditors and the estate.  The Court recounts the evidentiary hearing and conversations held with counsel for the parties and the resulting *Memorandum Opinion and Order* dated March 4, 2022, wherein the Court

24

lifted the automatic stay pursuant to 11 U.S.C. § 362(d) at the request of the Saints to allow the

parties to complete the Arbitration.  At that time, the Court *sua sponte* raised the issue of WDI's

motivation for filing its case and whether it filed with a valid bankruptcy purpose.  The Court

wrote:

> "[T]he Bankruptcy Code of 1978 has been endowed with requirements of good faith in the constructions of many of its provisions."  *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (citation omitted).  Indeed, "[l]itigation concerning good faith . . . has arisen under § 362(d) of the Bankruptcy Code governing relief from the automatic stay."  *Id*. (internal citation omitted).  At the preliminary hearing on the Lift-Stay Motion, the Court raised an issue concerning "cause" as it is used in § 362(d) as well as 11 U.S.C. § 1112(b) governing dismissal and conversion of cases.  The Court asked the parties whether this Debtor—with few creditors, very few assets, a potentially significant, adverse judgment looming, and a proposed plan of reorganization that relies upon the Debtor's rejection of the Settlement Agreement as an executory contract—filed its bankruptcy as a litigation tactic or with a legitimate bankruptcy purpose in mind.
>
> It is true that this case possesses some of the *Little Creek* hallmarks of a case that has not been filed in good faith:  (i) the Debtor has essentially one asset, and no employees except for the principals; (ii) a review of the monthly operating reports filed in this case reveals little or no cash flow with which the Debtor could fund a plan of reorganization; and (iii) this is essentially a two-party dispute where the Debtor has suffered adverse rulings in prepetition litigation.  *See id*. at 1072–73.  But counsel for the Saints made clear at the Hearing that the Saints do not seek to dismiss the case entirely.  *See* Hr'g Tr. 322:2–19.  And both parties cautiously suggested that the Debtor could propose a plan of reorganization that would allow the Debtor to move forward as a going concern.  *See* Hr'g Tr. 320:17–323:15.
>
> The Court acknowledges that "the concept of bad faith filing should be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances."  *In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001).  On balance, the Court believes that stay relief rather than dismissal is appropriate here, as the Court sees no indication that any other creditor has the need or desire to pursue the Debtor at this time.  *See id*. at 55.  Indeed, although "bad faith" has been held to provide cause for stay relief and dismissal, "[i]n view of the possibility of the filing of a new bankruptcy petition after dismissal of a case, the lifting of the stay is often a more prudent course for creditors."  *In re Setzer*, 47 B.R. 340, 344 (Bankr. E.D.N.Y. 1985).  The balancing of the *Curtis* factors above provide this Court with the requisite "cause" to lift the automatic stay to allow the Arbitration to be completed; therefore, the Court declines to make a finding of bad faith on the part of the Debtor and dismiss the case for "cause" at this time.

[ECF Doc. 169].

Fast-forward to today:  The Court has denied confirmation.  At the confirmation hearing, the Court listened to Ben Hales, the Saints' Senior Vice President and Chief Operating Officer, testify as to the amount of money that his organization has spent over the last decade litigating and arbitrating with WDI over the use of the WDI Marks.  *See* Hr'g Tr. 77:22–83:9 (June 22, 2023) ("It's a constant and expensive game of whack-a-mole that we've been playing for years, and apparently will be playing for years to come.").  The Court also heard testimony from Steve Monistere, WDI's President and co-owner, and came away from that testimony with the strong impression that WDI remains, at best, unskilled and without tools to acknowledge, address, or comply with the Permanent Injunction—despite WDI's co-owner being the intellectual property law attorney who represented WDI in the Arbitration.  At worse, WDI's owners are obstinate in their resolve not to comply with the Permanent Injunction.  Either way, WDI and its creditors will continue to suffer financially.  *See*  Hr'g Tr. 29:15–32:10; 87:6–104:8  (June 21, 2023).

This debtor has one asset: the WDI Marks.  The valuation of that asset is an interesting issue, as it has been and could be quite valuable if it is able to be paired or co-branded with the Saints' intellectual property.  It is difficult to know if the asset is valuable by itself.[10]  What we do know is that, whether it is licensed by WDI or is sold to someone who could co-brand it successfully, right now the asset is wasting and it remains the sole source of creditors' recovery in this case.  A chapter 7 trustee would provide an independent fiduciary who is experienced in marketing such an asset, reviewing the books and records of the estate for possible estate causes of action, and administering the estate efficiently.  As observed by a colleague in making a similar calculation:  "While there are costs attendant to a chapter 7 case, the Court is persuaded that, in

---

[10]     The parties' stipulation as to the value of the asset for purposes of WDI's liquidation analysis removed valuation as an issue to be tried at the confirmation hearing.

light of the powers the Bankruptcy Code vests in a chapter 7 trustee, conversion is better for creditors and the estate than dismissal—in which case the debtor's current management would retain control over the debtor's assets and creditors would be left to state-law creditor remedies." *In re Team Sys. Int'l LLC*, 640 B.R. 296, 320–21 (Bankr. D. Del. 2022). Moreover, "[a] chapter 7 trustee can certainly move to dismiss the case subsequently, if the trustee concludes that such relief is in the best interests of the estate." *In re FRGR Managing Member LLC*, 419 B.R. 576, 580 (Bankr. S.D.N.Y. 2009).

Most of all, conversion to chapter 7 would bring final resolution to the decade-old dispute between the parties here. The alternative of dismissal would likely leave the estate's significant unsecured creditor class as well as administrative expense claimants without relief, as nothing suggests that the disputes between WDI and the Saints will be resolved any time soon outside of this venue.

Therefore, based on the foregoing findings of fact and conclusions of law,

**IT IS ORDERED** that the WDI's *Plan of Reorganization*, as amended (the "Plan"), [ECF Docs. 71, 225, 267 & 289], is **DENIED**.

**IT IS FURTHER ORDERED** that the Saints' *Motion To Dismiss or, Alternatively, To Convert*, [ECF Doc. 218], is **GRANTED IN PART** and **DENIED IN PART**. The Court finds cause to convert or dismiss the case pursuant to 11 U.S.C. § 1112(b), but declines to dismiss WDI's case.

**IT IS FURTHER ORDERED** that WDI's case is **CONVERTED** to one under chapter 7 of the Bankruptcy Code.

An Order for appointment of a chapter 7 trustee pursuant to § 1112(b) of the Bankruptcy Code will be entered separately into the record.

New Orleans, Louisiana, this 27th day of March, 2024.

_____

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE